21-cv-733 PAM / HB

RECEIVED
BY MAIL

UNITED STATES DISTRICT COURT    MAR 18 2021

DISTRICT OF MINNESOTA    CLERK, U.S. DISTRICT COURT
ST. PAUL, MN

Brad Ronald Stevens,
                              Plaintiff
v.

Minnesota Department of Human Services,
Jodi Harpstead, Minnesota Sex Offender
Program, Executive Director Nancy
Johnston, Executive Medical Director Dr.
John Barry M.D., Peter Puffer, Kevin
Moser, Dr. Crystal Leal, Katherine
McDowell, Kathrine Schesso, Terry
Kneisel,

Minnesota Direct Care and Treatment,
Chief Executive Director Marshall Smith,
Executive Medical Director, Kylee Ann
Stevens, M.D.,

Goodhue County Health and Human
Services, Abby Villaran, Goodhue County
Attorney Stephen O'Keefe, Erin Kuester,
and/or Jane and John Does, in their official
and individually capacities,

                              Defendants.

**COMPLAINT FOR VIOLATIONS OF**

**THE CIVIL RIGHTS ACT OF 1871**
**( 42 USCS 1983)**

**AMERICAN DISABILITIES ACT**
**(42 U.S. 12132)**

**SECTION 504 OF THE**
**REHABILITATION ACT**
**(29 U.S.C. §794)**

**RELIGIOUS LAND USE AND**
**INSTITUTIONALIZED PERSONS**
**ACT OF 2000 (RLUIPA)**
**(42 U.S.C.S. 2000cc)**

The Plaintiff makes the following allegations for his complaint.

## INTRODUCTION

Minnesota's Department of Human Services has implemented unlawful tactics of blind

biases within its entities when dealing with ex-offenders. The unreasonable animus runs

loose, free and deep.  Troubling as that may seem, the Governor, State and County

Attorneys, State and County level Departments and Human Services, its Commissioners,

1

SCANNED
MAR 18 2021
U.S. DISTRICT COURT ST. PAUL

Directors and Employees have no boundaries when dealing with human beings they dislike. Plaintiff, Brad Ronald Stevens, brings this complaint against Defendants for violations of his constitutional and statutory rights. Plaintiff seeks a declaration against the named County and State officials, who have arbitrarily and capriciously stigmatized him, violated his religious practices and freedoms in the most egregious and discriminatory ways. Defendant have employed tactics to extend his criminal sentence beyond expiration after creating and designing a program for non-mentally ill sex offenders at a Department of Human Services Facility. Defendants have repeatedly avoided periodic medical assessment to review Plaintiff's present mental status due to the program is no longer medically necessary to justify the indefinite civil confinement. Plaintiff has completed his prison sentence, and therefore should be a free man, but for the ongoing wrongful stigmatization he suffer from a mental abnormity or personality disorder that causes his inability to control his behavior requiring "care and "treatment" in the current setting.

## JURISDICTION AND VENUE

1.    Plaintiff invokes this Court's jurisdiction under 28 U.S.C. § 1331(federal-question jurisdiction), 28 U.S.C. § 2201 (declaratory-judgment jurisdiction), 42 U.S.C. §1983 (civil rights statue), 42 U.S. 12132 (American with Disabilities Act (ADA), 29 U.S.C. §794: (section 504 of the Rehabilitation Act), 42 U.S.C. §2000cc (RLUIPA)) 28 U.S.C. 2241 (Writ of Habeas Corpus)

2.  This court also has supplemental jurisdiction over state law claims under Habeas Corpus pursuant to Minn. Stat. 484.03-04 (2018).

3.  Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because Defendants are a Minnesota state agency and public officials, with offices within the district court, and because events or omissions giving rise to the claims presented occurred within this district.

## PARTIES.

**Plaintiff.**

4.  Plaintiff Brad Stevens is currently 53 years old.  In November of 2004, he was involuntarily hospitalized pursuant to Minn. Stat. § 253B.185, prior to completing his term of imprisonment on November 21, 2005, and prior to November 22, 2005, the start of his term of probation, which allegedly ended November 21, 2014.  On August 25, 2005, he was indeterminately committed as a sexually dangerous person due to a mental illness that caused him to have lack of adequate control over his behaviors applicable to Minn. Stat. § 253B.18(c).  Since 2005, the Commissioner has not observed or has Stevens been sanctions for any behaviors associated with a mental disorder.  He currently resides at Minnesota Sex offender Program located at 1111 Hwy 73 Moose Lake, Minnesota. 55767.

**Defendants.**

5.  The DHS Defendants are responsible for transferring Plaintiff out of a medical treatment program for psychiatric disorders into a program to socially educate ex-

3

offender of their past crimes through implementing, retaining, carrying out policies and practices at the DHS Facility that violated the constitutional, statutory, and common law rights of Plaintiff.

a.  Defendant, Minnesota Department of Human Services is responsible for administering services under Minn. Stat. § 246B.01-02 for the objective purpose to care for dangerously mentally ill offenders.  Minnesota Department of Human Services is liable under the ADA, Rehabilitation Act and RLUIPA

b.  Defendant, Jodi Harpstead is the Commissioner of the Minnesota Department of Human Services.  Defendant Harpstead, is responsible for monitoring and administering services under Minn. Stat. § 246B.01-02 for the objective purpose to care for dangerously mentally ill or chemically dependent offenders.  Defendant Harpstead is sued in her official and individual capacity.

c.  Defendant Nancy Johnston is the Executive Director of the MSOP.  Defendant Johnston, implemented, retained and carried out practices that transferred Plaintiff out of a medical treatment program for dangerously mentally ill or chemically dependent offenders into an educational based program without a formal notice or explanation that justifies Plaintiff's continued commitment.  Defendant Johnston is sued in her individual and official capacity.

d.  Defendant Dr. John Barry M.D is the Executive Medical Director of MSOP.  Defendant Barry, implemented, retained and carried out practices that failed to monitor periodically reviews of Plaintiff's medical condition to ensure services

under Minn. Stat. § 246B.01-02 for the objective purpose to care for dangerously mentally ill or chemically dependent offenders that justifies continued commitment. Defendant Barry is sued in his individual and official capacity.

e. Defendant, Peter Puffer is the Clinical Director at the DHS facility. Defendant Puffer retained and carried out practices that failed to provide periodic reviews of Plaintiff's present mental status to ensure services under Minn. Stat. § 246B.01-02 necessary for the objective purpose to care for dangerously mentally ill or chemically dependent offenders that justifies continued care in non-discriminatory ways towards religion. Defendant Puffer is sued in his individual and official capacity.

f. Defendant, Kevin Moser, is Moose Lake Facility Director, is responsible for the Moose Lake facility regarding all other aspects of the facility to hold and incarcerate Plaintiff with the facility. He too, will enforce policies relating to the MSOP as is necessary. Defendant Moser is sued in his individual and official capacity.

g. Dr. Crystal Leal, is the Unit Psychologist at the DHS facility. Defendant Leal, retained and carried out practices that failed to provide periodic reviews of Plaintiff's present mental status to ensure services under Minn. Stat. § 246B.01-02; is narrowly tailored to meet the objective purpose to care for dangerously mentally ill or chemically dependent offenders that justifies continued care in non-discriminatory ways towards religion. Defendant Leal is sued in her individual and official capacity.

h. Kathrine McDowell, is the Unit Clinical Supervisor at the DHS facility. Defendant McDowell retained and carried out practices that failed to provide periodic reviews of Plaintiff's present mental status to ensure services under Minn. Stat. § 246B.01-02; is narrowly tailored to meet the objective purpose to care for dangerously mentally ill or chemically dependent offenders that justifies continued commitment care in non-discriminatory ways towards religion. Defendant McDowell is sued in her individual and official capacity.

i. Kathrine Schesso, is an Associate Clinical Director and sits on Media Review Committee at the DHS facility. Defendant Schesso, retained and carried out practices that failed to provide periodic reviews of Plaintiff's present mental status to ensure services under Minn. Stat. § 246B.01-02; is narrowly tailored to meet the objective purpose to care for dangerously mentally ill or chemically dependent offenders that justifies continued care in non-discriminatory ways towards religion. Defendant Schesso, is sued in her individual and official capacity

j. Terry Kneisel, is Moose Lake Assistant Facility Director, is responsible for the Moose Lake facility regarding all other aspects of the facility to hold and incarcerate Plaintiff with the facility. He too, will enforce policies relating to the MSOP as is necessary. Defendant Kneisel is sued in his individual and official capacity.

k. Minnesota Direct Care and Treatment is liable for services under Minn. Stat. § 246B.01-02 for the objective purpose to care for dangerously mentally ill or chemically dependent offenders that justifies continued commitment. Minnesota

Direct Care and Treatment is named Defendant liable under the ADA, Rehabilitation Act and RLUIPA

l.  Marshall Smith is the Chief Executive Director of Minnesota Direct Care and Treatment. Defendant Smith, wrote and oversees policies and their implantation as they affect dangerously mentally ill or chemically dependent offenders incarcerated in non-discriminatory ways at the MSOP at Moose Lake. Defendant Smith is sued in his individual and official capacity.

m. Defendant Dr. Kylee Ann Stevens, is the Executive Medical Director of Minnesota Direct Care and Treatment. Defendant Stevens wrote and oversees policies and their implantation as they affect dangerously mentally ill or chemically dependent offenders incarcerated in non-discriminatory ways at the MSOP at Moose Lake. Defendant Stevens is sued in her individual and official capacity.

n.  Goodhue County Health and Human Services, is liable for protecting Plaintiff by monitoring services provided by the DHS facility under Minn. Stat. § 246B.01-02, is narrowly tailored to meet the objective purpose to care for dangerously mentally ill or chemically dependent offenders that justifies continued commitment. Goodhue County Health and Human Services is named Defendant liable under the ADA, Rehabilitation Act and RLUIPA

o.  Abby Villaran, is a County manager of Plaintiff's DHS case file. Defendant Villaran, retained and carried out practices that failed to monitor periodically reviews of Plaintiff's medical condition to ensure services under Minn. Stat. §

246B.01-02 was narrowly tailored to meet the objective purpose to care for dangerously mentally ill or chemically dependent offenders that justifies continued commitment. Defendant Villaran is sued in her individual and official capacity.

p. Goodhue County Attorney Stephen O'Keefe is now responsible for continued civil commitment proceedings under Minn. Stat. § 253B.185, for continued enforcement of involuntary hospitalization at the DHS Facility.   Defendant Stephen O'Keefe is sued in his official capacity

q. Goodhue County Assistant Attorney Erin Kuster was responsible for commencing civil commitment proceedings under Minn. Stat. § 253B.185, for presenting the case of involuntary hospitalization to the court and for continued enforcement of the acts. Defendant Erin Kuster is sued in her official capacity.

r. Jane and John Does who act or are responsible for any act or inaction under the Minnesota Commitment and Treatment Act.   Defendant Jane and John Does is sued in her or his  individual and official capacity.

6.   In all respects material to this action, all Defendants acted under the color of law and under the color of their authority as employees of the DHS or County Agencies within the State of Minnesota

7.   In all respects material to this action, all Defendants acted outside the legitimate government interest as established by the Federal Statutes and the United States Constitution.

8.    Specifically, Plaintiff alleges Defendants, in their official capacity and where applicable, in their individual capacity, have, among other things;

a)  failed to provide medically justified care and treatment to Plaintiff's mental health condition by avoiding assessments based on observable behaviors;

b)  provided staff that are poorly trained or incompetent clinicians using outdated outmoded or discredited technics to assess present mental status;

c)  failed and refused to provide Plaintiff with timely and accurate feedback concerning his treatment progress, his goals for future treatment, only to explain they are addressing Plaintiff's risk to reoffend and because they are not a medical professionals, so they cannot answer whether his treatment is medically necessary and or if Plaintiff is ready for conditional or full discharge;

d)  refused to provide a formal notice or an adversarial hearing to Plaintiff why he was transferred out of a medical treatment program for mentally disordered and chemically dependent offenders and into an educational based program designed only to reduce risk of future sex offense;

e)  Defendants have failed to accommodate Plaintiff's requests for treating his chemically dependency and substance abuse disorders, which refusals are then used to deny Plaintiff's reintegration opportunities before the Commissioner's Review Boards;

f) engaged in viewpoint discriminations against Plaintiff who carries substance abuse disorders from obtaining drug education media relating to his religious practices while civilly committed at MSOP Facilities;

g) failed to accommodate Plaintiff's religious practice of Scientology that prevents crossbreeding mental health studies with other mental health material unless prescribed by a medical doctor and or is medically justified;

h) discriminated against Plaintiff from obtaining additional services in paid vocational training and advancement in other areas of the program due to religious practices, that result in restraining him from purchasing other religious material and support his faith based practices.

9.     Plaintiff seeks remedies that include declaratory relief for continuing violations of federal law in Defendants official capacity.

10.  Plaintiff also seek compensatory damages based on Defendants' actions in their individual capacity to violate Plaintiffs' constitutional and statutory rights.

## DEFINITIONS

11.  The following definitions will have the meaning given by statute and interpreted by the judiciary governing laws and facts as applied to the Constitution as follows:

a. A person who has a mental illness and is dangerous to the public is a person:

(1) who has an organic disorder of the brain or a substantial psychiatric disorder of thought, mood, perception, orientation, or memory that grossly impairs

judgment, behavior, capacity to recognize reality, or to reason or understand, and is manifested by instances of grossly disturbed behavior or faulty perceptions; and **(2)** who as a result of that impairment presents a clear danger to the safety of others as demonstrated by the facts that (i) the person has engaged in an overt act causing or attempting to cause serious physical harm to another and (ii) there is a substantial likelihood that the person will engage in acts capable of inflicting serious physical harm on another. Minn. Stat. 253B.02, subd. 17. (2016).

b. State-operated treatment program means any state-operated program including community behavioral health hospitals, crisis centers, residential facilities, outpatient services, and other community-based services developed and operated by the state and under the commissioners control for a person who has a mental illness, developmental disability, or chemical dependency. Minn. Stat. 253B.02, subd. 18. (2016).

c. *Treatment facility*: is defined as "a hospital, community mental health center, or other treatment provider qualified to provide care and treatment for *mentally ill*, mentally retarded, or chemically dependent persons." Minn. Stat. 253B.02, subd. 19. (2016).

d. *The term* mental illness and mental disorder are devoid of talismanic significance. "Not only do psychiatrists disagree widely and frequently on what constitutes a *mental illness,* but the court itself uses a variety of expressions to describe the mental condition of those properly subject to civil confinement. The

11

key to all these definitions for purposes of civil commitment is that they reflect the individual's *"inability to control his dangerousness."* Hince v. O'Keefe, 632 N.W.2d 577, 582 (Minn. 2001); *Kansas v. Hendricks*, 521 U.S. 346, 360 (1997).

## RELEVANT STATUARY LAWS.

12.  Minn. Stat. 253B.185, subd. 1(a) (2004) states; that the provisions of the Minnesota Commitment and Treatment Act that pertain to persons who are mentally ill and dangerous to the public apply "with like force and effect to persons who are alleged or found to be sexually dangerous persons."

13.  Minn. Stat. §253B.03 (2018) provides certain rights for civilly committed patients. Section 253B.03, subd. 5 provides that a civilly committed patient has the right to periodic medical assessment, including assessment of the *medical necessity of continuing care*. The physical and mental condition of a civilly committed patient shall be assessed by the treatment facility as frequently as necessary, but not less often than annually.

14.  Minn. Stat. § 253B.03, subd. 7 provides that the treatment facility shall devise a written program plan for each committed person, reviewed on a quarterly basis, which describes in behavioral terms the case problems, the precise goals, including the expected period of time for treatment, and the specific measures to be employed.

15.  The right to periodic medical assessment for continued medical care and treatment has been subjected to a test that "is one of medical necessity and not simply that which may be considered merely desirable." *See Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)

## Factual Allegations

A. <u>Plaintiff Was Committed As A Sexually Dangerous Person</u>.

16.  On March 14, 2003 Plaintiff was sentenced to a 36 month term of imprisonment expired.  In November of 2004, before he was to be released on supervise release from the criminal court imposed sentence.  The State alleged Stevens criminal behaviors provide a factual basis for believing that he meets the criteria of a Sexual Psychopathic Personality (SPP) and Sexually Dangerous Person (SDP) as defined in Minn. Stat. 253B.02 subd. 18b and 18c.

17.  The State further alleged due to these behaviors, he is in need of hospitalization and no suitable alternative to involuntary hospitalization exists as alleged in their petition for civil commitment.

18.  On April 25, 2005 Goodhue County District Court, First Judicial District issued a Sexually Dangerous Person ("SDP") verdict under Minn. Stat. 253D.02, subd. 12(a)

19.  Minn. Stat. §§253D.02; Subd. 12. *Sexually Dangerous Person.* **(a)**. A sexually dangerous person means a person who:**(1)**. has engaged in a course of harmful sexual conduct as defined in subdivision 7a; **(2)**. has manifested a sexual, personality, or other mental disorder or dysfunction; and **(3)** as a result, is likely to engage in acts of harmful sexual conduct as defined in subdivision 7a.**(b)**.  For purposes of this provision, it is not necessary to prove that the person has an inability to control the person's sexual impulses.

*20.*  The sexually dangerous person (SDP) statute, Minn. Stat. 253B.185 (2004), requires a showing of future dangerousness linked with an existing mental disorder making it difficult, if not impossible, for the person to control his dangerous behavior.

21.  On August 25, 2005 the court issued an Indeterminate SDP Judgment, Civilly Committing Brad Stevens to the Minnesota Sex Offender Program, operated by State Operated Services of the Department of Human Service pursuant Minn. Stat. § 253B.18 subd. 2 and 3. (2004).

22.  After plaintiff's 36 month term of imprisonment expired, on November 22, 2005 Plaintiff began serving the 2003 criminal court's imposed 10 year conditional *release* term, providing that conditions of release may include successful completion of treatment and that if the offender fails to meet any condition of release, the commissioner may revoke the offender's conditional release and order that the offender serve the remaining portion of the conditional release term in prison. Minn. Stat. § 609.109 subd. 7(b).

23.  Despite plaintiff had not violated any rules of release, the civil commitment courts Indeterminate Order enhancing the residential sex offender treatment to non-residential treatment  previously imposed by the criminal court with violating any rules of release.

24.  Once Committed to the MSOP, Plaintiff who has been adjudicated as a SDP remains there until such time as a the Commissioner and other MSOP employees finds that he will not likely to engage in acts of sexual violence.  In other words, in order to regain his liberty, Plaintiff –the involuntary hospitalized ex-offender must establish that he has been

successfully treated for the mental abnormality or personality disorder that was the basis for his confinement to the MSOP.

25.  That tactic has changed over a decade ago, after Plaintiff mental abnormality, personality or substance dependency disorders no longer affects his inability to control his behaviors.

26.  The DHS through the MSOP, is required to provide or arrange for treatment for a person committed pursuant to Minn. Stat. § 253B.185.  Such treatment must be appropriate tailored to address the specific needs for dangerously mentally ill or chemically dependent offenders.  DHS is also required to promulgate regulations governing the treatment of Plaintiff at the MSOP.  State Hospital Administrative Rule 915.3040 subpart 1, includes psychiatric, medical, dental, psychological, social, and advocacy services; educational programming, assessment and treatment of chemical dependency; vocational rehabilitation services; and leisure and recreational activities.

27.  Such regulations must take into considerations the rights of MSOP patients and must specifically address the differing needs and specific characteristics of and treatment protocols related to sexually dangerous persons.

28.  The treatment requirement written into the MSOP serves, amongst other things to distinguish civil commitment under the MCTA from typical recidivist offenders and punishment, which is forbidden by the Double Jeopardy Clause contained in the Fifth Amendment to the United States Constitution.  Adequate treatment of Plaintiff's mental health condition is also required by the Due Process Clause, contained in the Fourteenth

Amendment to the United States Constitution, which prohibits state entities and officials from depriving Plaintiff of his liberties due to a treatable mental health condition without also making reasonable efforts to treat the condition, so as to afford the affected person a meaningful opportunity to regain his liberty. In addition to the Eighth Amendment, which prohibits cruel and unusual punishments, requires that Plaintiff who is involuntarily hospitalized due to an asserted mental health disorder be provided with adequate treatment for that disorder.

29. Plaintiff also has a right to adequate mental health treatment pursuant to the American with Disabilities Act (ADA), 42 U.S. 12132 and section 504 of the Rehabilitation Act, 29 U.S.C. §794 as set forth within the complaint and the Act itself.

30. Notwithstanding their legal obligations to Plaintiff, defendants have failed and refused to provide written reasons why he was removed from a medical model program designed to treat his alleged personality traits and chemical and substance abuse /dependency condition, with which he was diagnosed as a precondition to commitment.

31. Although the MSOP mandates that treatment be tailored to the specific needs of Plaintiff, due to a change in the program without formally notifying Stevens, virtually no medical treatment is offered to specifically address these conditions.

32. The primary mental health treatment provided to Plaintiff is in a form of group theory administered in "process groups" to address his past crimes. This is the only therapy provided, which group processing violates Plaintiff's cultural based mental health practice through his religion of Scientology.

16

33.  To be effective, treatment must be tailored to individual needs and staff must be specifically trained in their clients religious practices to ensure cultural sensitivity and disparity.

34.  Plaintiff's treatment team openly admits they know nothing of Scientology or its practices despite defendants have found Plaintiff a sincere practitioner of the Scientology's faith.

35.  Plaintiff has shown biblical writing from Scientology material that include therapy between the patient and the therapist and does not include group processing.  Despite sex offender therapy also includes one on one therapy.

36.  Rather than accommodate Plaintiff's religious practices after informing defendants of Scientology's does and don'ts in relation to its cultural based spiritual and mental healing of the religion.  Defendants have stated Plaintiff's completed courses in mental health and substance abuse through Scientology has no spiritual value to credit it toward their program.

37.  Because Defendants will not accommodate Plaintiff's religious practices, he is denied advanced paid vocational opportunities and services necessary to advance him within the program to gain support for reintegration services.

38.  Defendants have refused to accommodate Plaintiff religious practices since re-admission in 2014.  Since then, Plaintiff spiritual healing on his mental health includes a full spectrum of achievements that include the following;

a. First Generation of Minnesota Sex Offender Program ("MSOP") Moose Lake Tier Level 4 Privilege Programming (*5 out of 400+ clients).* First Generation Tier 5 Privilege Programming (*3 out of 400+ clients).* (Established January 9, 2019), based upon a history role modeling and of pro-social behavior.

b. Four Term Unit Representative of MSOP Communities. (Elected March 2019 to present) based upon being role model and leader for the therapeutic community.

c. Current Council Member of Conflict Resolution Council Member (CREST). (Selected September 2018 to present) showing leader roles to resolve conflict for the therapeutic community

d. Liaison Representative for Moose Lake Chapter 35 Alcohol Anonymous ("A.A."). (Elected February 1, 2020 to present) being able help other with alcohol addictions.

**Training:**

e. Monthly Clinical/Client Unit Representative Process Training for MSOP Communities. Instructor MSOP Clinical Director Peter Puffer MA., LP., Associate Clinical Director Nancy Stacken MA., LP. (2019 to present)

f. Biannual Conflict Resolution Guide Training (CREST). Instructor Stacy Rhodes M, MSW, LICSW. Allison Collins M.A. (2019 to present)

**Membership and Organizations:**

g. Universal Life Church, 601 Third St. Modesto, CA 95351. (Ordained Minister, August 8, 2003)

h.  Member of Church of Scientology Twin Cities, 505 North Wabasha St., Saint Paul, Minnesota 55102 (November 2018 to present)

i.  Member of International Association of Scientology, 6331 Hollywood Blvd, Los Angeles, California 90028 (December 2014 to present)

j.  Adjunct Student Educator of Scientology Technical Material of Mental Health. (Student Educator Group of 2015)

k.  Member of Moose Lake Chapter 35 Alcohol Anonymous.  (September 2019 to present)

l.  Member of MSOP's Resident and Family Council (RAFC).  (Elected January 22, 2020 to present)

m. Executive Advisor of OCEAN. See; thevoicesofocean.net

39.  Plaintiff's accomplishments just show the treatment team poorly trained psychologist and mental health staff with no background or knowledge in Scientology to assess the value of his spiritual healings to balance those teachings necessary to deliver a quality of service to meet individuals spiritual and mental health needs.

B.  MSOP's Program Theory Manual.

40.  MSOP currently prescribes a three phase psycho-education program plan designed from 11 Goal Matrix Factors.

41.  MSOP is the only program in the World that uses Matrix factor.  As the Matrix Factors were created by MSOP employees.

42. The program is designed to address the client's past crimes of criminal sexual conduct.

43. MSOP's 2014 Theory Manual cites the word Criminal 18 times, the word Criminogenics or criminology cited 14 times, Crime is sited 24 times. Mental illness is mentioned twice by reference to other information.

44. MSOP's Program Theory Manual includes responsivity principles. The Manual instructs interventions should be delivered in a manner consistent with offenders' personal circumstances. *See Program Theory Manual p. 10 of 56.*

45. The Treatment Manual has principles of important considerations include *culture.* The manual states; Thus, in order to be most effective, sexual offender treatment programs must tailor services to match individual characteristics. It is incumbent on treatment providers to find alternative opportunities for individuals to complete the required program work. *Id.*

46. Plaintiff's has been informed the Matrix Factors are not designed as an active medically–based prescription for treatment to diminish or alleviate any psychiatric symptoms that he may have experienced for the mental health diagnosis received.

47. Rather MSOP's program plan is designed to educate and hold clients accountable for their past crimes of criminal sexual misconduct.

48. Defendants further understand the facility's tactic is to be used as an otherwise punitive holding cell rather than a treatment facility for a psychiatric condition.

49. Plaintiff is currently offered core group processing designed from a Matrix Goal Factor System. The program was created non-medical MSOP employees designed from best practice and research in sex offender treatment to non-mentally ill sex offenders.

50. MSOP's current program is based upon a III Phase program, that requires clients to master the Matrix Factors. The Matrix Goal Factors can be dispensed by all staff and clients to educate others upon Matrix Factors.

51. Matter of fact, as part of Stevens assigned leadership position as a CREST Counsel Member and a past Unit Representative role model for the therapeutic community. Stevens is required to educate others on how he interprets the Matrix Factors and how to apply them to ensure MSOP remains a therapeutic treatment setting, despite being Scientologist.

52. Stevens can remained committed to the MSOP just by not signing the consent form. He has since signed the consent form to compel MSOP to make accommodations to Scientology, despite having no discipline or behavioral incident since being committed.

53. MSOP has again refused Stevens request to accommodate his religious practices even after signing the consent form.

54. Because MSOP changed the program to an educational based program, Stevens can remained committed regardless of Stevens' psychiatric disorders no longer has an effect on his emotions or controls his behaviors. Which were the original reason for Stevens original commitment to the MSOP.

21

55. Based upon these circumstances, Plaintiff's clear federally protected rights establishes he is ready for reintegration to socially grow with society.

56. Despite Plaintiff is currently offered psycho–educational modules designed to address specific topic or skills such as relapse prevention, victim empathy, arousal, relationships and anger management in relation to his past crimes. Those factors can be worked on in a less restrictive alternatives and should not be the reason to confine Plaintiff..

57. Again no modules are currently being provided that are identified for Plaintiff's chemical dependency or substance abuse. Despite he is currently the liaison client for the local Alcohol Anonymous Chapter 35 of the Moose Lake area at the facility.

58. Plaintiff was recently denied discharge, due to Defendant reported Stevens has not signed the consent form or completed such chemical dependency or substance abuse modules to progress toward discharge. The records show "The Department" does not currently offer chemical dependency modules.

C. Plaintiff's Periodic Reviews By The MSOP since re-admission in 2014.

59. Upon admittance to the MSOP-DHS in 2014, Facility, Connie Proctor, Admission Coordinator/Legal Assistant sent out e-mails to assigned clinical and security staff, mailing; "MSOP Client Brad Stevens is scheduled for readmission this Friday, November 21, 2014. According to the most updated information in the DOC COMS database, there is no discipline listed for this client since he was revoked in 2006. The client does not

have any critical mental health problems noted. According to COMS he is not associated with any Security Threat Groups." (Exhbit-A)

60. On November 21, 2014 after Plaintiff was re-admitted to the MSOP's secure hospital without mental health concerns. On December 2, 2014 Sara E. Herrick, MA, LP, LPCC,CCFC, sent emails in regards to Brad Stevens observed mental function. Ms. Herrick opined he does not present with a mental health issue at this time, yet this is tough to evaluate given he has chosen not to participate. He plans on doing his own treatment through Scientology. (Exhbit-B)

61. Every year since 2014, Plaintiff has participated in MSOP's annual mental health assessment and was informed the nature and purpose of the evaluation.

62. Plaintiff has consented to the interviews and was informed that the "Mental Health Assessment would be written with or without my participation and that whether he chose to participate was entirely Plaintiff's decision.

63. Although Plaintiff consented and participated fully with the assessment, he is unaware of a diagnostic or treatment methodology that does not require participation or direct observation of the subject. Taking into consideration that current mental health and behavioral diagnosis and prognosis on historical documentation alone is not a valid methodology

64. Defendant Leal and alike mental health assessors use outdated procedure to assign various mental disorders based upon re-examining pre-commitment behaviors. Each and every time Stevens diagnoses were not anchored on observable behaviors. This

procedure does not reflect Plaintiff's present mental health status, as the diagnoses does not affect his ability to control behavior, which indicate he is no longer mentally ill or dangerous due to an illness under state law.

65. Defendant Leal after a February 5, 2012 Care Conference informed Stevens that his diagnosis does not mean anything. Dr. Leal stated she could have diagnosed him with a butterfly disorder and does not mean anything. He needs to address his risk to the public and this is done by processing the Matrix Factors. *See Declaration of Stevens at ¶9*

66. Plaintiff since being re-admitted in November of 2014, he has been assigned diagnoses from the Diagnostic and Statistical Manual of Mental Disorders (DSM) from reviewing his past history that including the following: F65.89 Other Specified Paraphilic Disorder, In a Controlled Environment; F60.89    Other Specified Personality Disorder, With Antisocial and Narcissistic Features; F10.20Alcohol Use Disorder, Severe, In Sustained Remission, In a Controlled Environment; F12.10 Cannabis Use Disorder, Mild, In Sustained Remission, In a Controlled Environment;  F14.10 Cocaine Use Disorder, Mild, In Sustained Remission, In a Controlled Environment.

67. The DSM-5 makes it crystal clear, that it's often been misinterpreted, that just because a patient has a disorder doesn't mean that there's a volitional dyscontrol problem with that disorder. Plaintiff's mental disorders does not affect his ability to control his actions and take full responsibility for them.

68. Further, DSM states; "when an individual has a substance use disorder, it is important not to make a personality disorder diagnosis based solely on behaviors that are

consequences of substance intoxication or withdrawal or that are associated with activities in the service of sustaining substance use (e.g., antisocial behavior)." DSM-5 *Substance use disorders.* Page 649.

69.  Absent substance use, Plaintiff's history of sobriety is highly probative to exclusion of these mental disorders as required by the DSM-5

70.  Minn. Statute Section 253B.02, subd. 13 subd. (b)(4);  A person is not mentally ill under this section if the impairment is solely due to dependence upon or addiction to any alcohol, drugs, or other mind-altering substances.  For these same reasons, inclusion of dependence upon or addiction to any alcohol and/or drugs during sexual violent behavior would also be an exclusions of other mental disorder implied by the MCTA.

**Expert Affidavit.**

71.  Plaintiff's family has retained Dr. Frederick Winsmann P.H.D., to evaluate his mental status while at the DHS Facility.  Dr. Winsmann, is a licensed psychologist who teaches at Harvard Medical School, Department of Psychiatry.  Dr. Winsmann, is a leading expert on the issue of volitional control in sex offenders.  He is the founder of the Boston Symposium on Psychology and the Law, an annual event that brings together experts in the field of psychology and psychiatry, as well as the law  to discuss difficult topics and advance the field. See *United States v. Wooden*,887 F.3d 591, 579 (4th Cir. N.C., Apr. 10, 2018)

72.  Dr. Winsmann's expert affidavit shows while Mr. Stevens liberties are at stake in a forensic setting, Stevens' diagnosis must be anchored on observable behaviors.

73.  Dr. Winsmann opined included literate from the DSM-5 author of Michael First. Dr. Winsmann cites; "Rape is always a crime and is never, by itself, sufficient evidence of a mental disorder.  There was little interest (and very little research) in the psychiatric status of rape until it became a convenient way to subject rapists to involuntary psychiatric commitment after their prison sentences has been served."  *Winsmann Affidavit at ¶12*

74.  Dr. Winsmann opined the DHS's diagnosis given to Stevens, is an "inappropriate medicalization of criminal behaviors to serve a practical public safety purpose." *Winsmann Affidavit at ¶12*

75.  Dr. Winsmann opined the DHS's diagnosis "been assigned to Mr. Stevens, are not mental disorders or diagnosis." *Winsmann Affidavit at ¶27*

76.  Other experts, such as Dr. Allen Frances, M.D., author of the DSM-IV.  Dr. Frances per reviewed ligature such:  Misuse of Diagnostic and Statistical  Manual in Sexually Violent Predator Cases. *Journal of the American Academy of Psychiatry and Law, 48(2).(2020)*

77.  Dr. Michael First, M.D. Author of the DSM-5. Clinical Utilities in the Revision of the Diagnostic and Statistical Manual of Mental Disorders (DSM) Professional Psychology: Research and Practice,  41(6), 465-473 (2010)

78.  MSOP's diagnosticians and alike review board evaluators have not asserted best practices by leading experts.    Stevens diagnosis are not anchored on observable behaviors.    Dr. Winsmann opined Stevens does not have a valid mental disorder sufficiently reliable to assist (clinical utilities) treatment and supervision needs at the MSOP.

79.  Defendant Leal, and alike diagnosticians, unnamed Jane and John Does when assigning diagnosis to Stevens has engaged in professional standard of care that fall below those standards by the literature in best practice.

80.  Dr. Winsmann's leading expert opinion is the exact reason why Defendant Johnston changed the program.  The Departments animus runs deep and each defendant has chosen to willful and maliciously turn blind eyes to what others can clearly see towards the deliberate indifferent to Plaintiff's freedoms.

D. <u>MSOP Changed The Program From A Medical Treatment Program To A Sex Offender Treatment Program For Non-Mentally Sex Offender.</u>

81.  In 2005, Stevens was civilly committed to a state operated service institution expressly designed to provide psychiatric care and treatment for dangerously mentally ill sex offenders.

82.  Defendant Nancy Johnston informed Stevens of the Executive Branch decisions to remove him from state's medical treatment program.

83.  Defendant Nancy Johnston further informed Stevens that the decisions to remove him from a hospital like environment for mentally ill patients was due to he had

demonstrated control of his behaviors and did not express symptoms of mental illness requiring treatment from a medical model.

84.  Previously, in May of 2013, Plaintiff was before the Commissioner's Commitment Appeal Panel. The Panel found Stevens met his burden of production entitling him to full discharge. Due to the political climate, Stevens later withdrew his petition.

85.  Stevens later discovered Minnesota Governor Mark Dayton's letter to then Commissioner Lucinda Jesson. The letter indicated it was the states tactic to use MSOP facilities to strengthen older weaker criminal sentences for sex offender treatment. (Exhbit-C)

86.  Defendants Harpstead, Johnston, Barry,  Puffer, Moser, Leal, McDowell, Smith, and Stevens while acting under color of state law, in their individual capacity as well as their official capacity knew or should have known that the customs, or practices of administratively transferring dangerously mentally ill sex offenders that no longer required involuntary hospitalization for psychiatric care were actually reason to reintegrate them back into society to socially grow and was unlawful.

87.  Defendants Defendants Harpstead, Johnston, Barry, Puffer, Moser, Leal, McDowell, Smith, and Stevens  while acting under color of state law in their individual capacity as well as their official capacity continued to enforce the unlawful practice or policy of confining non-mentally ill patients at the MSOP rather than reintegrate them back into society to socially grow.

88.   Defendant McDowell has stated to Stevens the treatment team is not going to accommodate his Scientology request for only one on therapy, he can seek relief from the court, not the MSOP. *See Declaration of Stevens at ¶7-8*

89.   Defendants have refused to accommodate Plaintiff's religious practices contrary to their polices. *See Declaration of Stevens at ¶10*

90.   Defendants Harpstead, Johnston, Barry, Puffer, Moser, Leal, McDowell, Smith, and Stevens while acting under color of state law in their individual capacity as well as their official capacity knows Mr. Stevens current confinement is not rationally related to a legitimate non-punitive governmental objective, deliberate indifferent to rights, imposed additional sanctions for past crimes, discriminate against Americans with Disabilities, their rehabilitation rights and religious practices in relation to confining alleged dangerously mentally ill of chemically dependent offenders.

91.   Defendants Harpstead, Johnston, Barry, Puffer, Moser, Leal, McDowell, Smith, and Stevens tactics not only discharged Stevens from commitment to a state operated institution expressly designed to provide psychiatric care and treatment of the dangerously mentally ill.   The defendant tactics erases any finding Stevens has a serious inability to control his behavior as a Sexually Dangerous Person due to a mental abnormality or personality disorder requiring medical treatment. Reasons related to the Civil Commitment Court impositions on Plaintiff.

92.  In addition to the above named defendants, Goodhue County Human Services and County Attorney continued to be directly involved to enforce continued confinement of Plaintiff.

93.  Goodhue County Department of Human Services and is managers, Abby Villaran are sent quarterly and annual reviews letter by MSOP's treatment team, invited them to Mr. Stevens treatment updates.

94.  Goodhue County Department of Human Services and is managers, Abby Villaran have refused to attend Stevens quarterly and annual reviews.

95.  Goodhue County Department of Human Services and manager, Abby Villaran has a special relationship to protect Mr. Stevens rights against abuse and waivered services noted above.

96.  Mr. Stevens has routinely forwarded letters notifying Goodhue County Department of Human Services and manager, Abby Villaran that MSOP has changed their program and requests county intervention on the misuse, abuse and discriminations against his religious practices at the MSOP.

97.  More recently Defendant Villaran told the Commissioners review board that the County does not have finances to accept Plaintiff back to the community, despite his previous letters.

98.   Goodhue County Attorney Stephen O'Keefe and Asst. Erin Kuester has also been notified as an officer of the Court of the changes to the program that results in misuse, abuse and discriminations against religious practices at the MSOP.

99.   Despite Plaintiff's begging for help, Defendants from Goodhue County has chosen not to act on Plaintiff's reports of constitutional violations.

   E.   Scientology Religious Practices and continued educational studies.

100. Prior to being re-admitted to the MSOP in November of 2014.  Mr. Stevens was indoctrinated into Scientology and has been an ethical member and currently has good standing in the church. (Exhibit D)

101. To "indoctrinate" means "to instruct in a body of doctrine or principles. . . . To imbue with a partisan or ideological point of view . . . ." The American Heritage Dictionary of the English Language 894 (4th ed. 2000).

102. Members from the Twin Cities Church of Scientology of Minnesota have judged Mr. Stevens to have good standing within the Organization, as well as members of International Association Church of Scientology.

103. Plaintiff through his membership has contributed hundreds of dollars to the Church of Scientology that aid commerce across the world to International Associations of other Scientologists that purchase religious material to advance his faith based practices, but also unite a world without war, criminals and insanity.

104. Because of the Department's ban on accommodating Plaintiff programing request for his religious practices, he is denied advanced paid vocational hours that affects, commerce with foreign nations and among the several states.

105. Defendant have found Plaintiff to be a devoted Scientologist and his religious practices are sincerely held.

106. Scientology's culture includes sub-studies in Dianetic therapy. The spiritual nature of Dianetic teaching to Scientology includes material that instructs the Does and Don'ts of Dianetics. Scientology spiritual studies include "don't mix alcohol and gasoline or Dianetics and other therapy, except purely medical, dispensed by a professional medical doctor." Dianetics The Modern Science of Mental Health at p. 477-478; (Exhibit E)

107. *Therapy* is defined as: The administration and application of Dianetics techniques and procedures to resolve problems concerning human behavior and psychosamitc illness.

108. *Auditing* is defined as: The technique of therapy is done in what is called a Dianetic *reverie*. The individual undergoing this process sits or lies in a quiet room accompanied by a friend or professional therapist who acts as an auditor.

109. *Dianetic Therapy* is identified by a singular patient and therapist and prohibits group therapy under the ideology of and causes of mental snarling.

110. While at the MSOP, Plaintiff is routinely invited to the Church of Scientology in St, Paul Minnesota. As a member of IAS, he is invited to attend celebrations and other

events that include quest speakers from around the world. Some of these topics include drug education, world views, volunteering on a global front and COVID-19 safety measures.

111. Plaintiff is always denied request to attend the special events as a member of Scientology, because he has not progressed far enough in the program, despite having no signs or symptoms of mental illness or dangerousness due to mental illness.

**Furtherance of Religious Education**

112. In July of 2020, a minister from the local Church of Scientology was aware and understood Mr. Stevens history of substance abuse, experiences and rehabilitation work completed upon Scientology material while at the MSOP.

113. Due to THE COVID-19 Pandemic, the Church entertained Mr. Stevens request to purchase an educational Course packet of "Truth About Drugs" from the Drug Free World Organization 1626 N. Wilcox Ave, #1297 Los Angeles California 90028

114. Scientology has Drug Treatment Centers under the trademark name of Narconon. Members who complete the Drug Free World Educator's Guide and bookwork are eligible for being a field representative Narconon Drug Treatment Centers.

115. Scientology has made public announcement that they support and promote like minds of a Drug Free World organizations.

116. The Truth About Drugs is a program of the Foundation for a Drug-Free world, a nonprofit public benefit organization. The Foundation's purpose to empower youths and adults with the facts about drugs so they can make informed decisions to be drug free.

117. Drug Free World Program Coordinator Judi Shervell, processed Plaintiff's requested Truth About Drugs packet and mailed it to the Department at the Moose Lake address.

118. Program Coordinator Shervell, cover letter to Mr. Stevens stated: "Studies suggest that young people who haven't taken drugs by age if 21 are unlikely to ever start. *Education* is the key-teaching kids about the truth about drugs as early as possible."

119. "The centerpiece of this *educational* package is the Truth About Drugs, a hard hitting, no holds-barred documentary film that covers each of the most commonly abused drugs.  Told in the straight talk that is the hallmark of our program, it contains firsthand accounts from survivors of drug education."

120. The drug educational material included a training booklets, posters, course manual and digital video disc (DVD).

121. The Course instructed Mr. Stevens, "now please do the following:"

    1) Watch the enclosed DVD introducing you to 17 public service announcements and the Truth About Drugs documentary film.

    2) Look through The truth About Drugs booklet series.  We have supplied 24 sets for your class and you may order more. See order Form.

3) Review the Educator's Guide with its lesson plans. It includes instructions on how to service you better.

4) Please fill out and send in the enclosed questionnaire card which will allow us to serve you better.

122. The Course further states: For any assistance in implementing The Truth About Drugs educational program or to order additional booklets, please contact us; drugfreeworld.org

123. For Mr. Stevens to begin the Drug Free World Educator Guide and become a drug educator and field representative for Narconon, he is instructed to watch the DVD first.

124. On August 26, 2020, upon arrival at the MSOP Property Staff Amanda Hyke forwarded a contraband notice to Mr. Stevens.

125. Defendant Hyke found the Truth About Drugs (DVD) (2019) had no rating and the content not considered educational, not on media list, not eligible for review.

126. Mr. Stevens appealed the contraband notice to the Media Review Committee (MRT) that consisted of Clinical Program Manager Jamie Houk and Associate Clinical Director Katherine Schesso.

127. On September 1, 2020, Mr. Stevens requested approval of a DVD-the Truth About Drugs DVD, as it was part of his Drug Educator kit received from the Drugs Free World Org.

128. Mr. Stevens informed the staff the Drugs Free World Org works with his members from Scientology. The DVD has a therapeutic component since there is no A.A. or substance abuse treatment at the MSOP during the COVID—19 pandemic.

129. On September 8, 2020, Amanda Hyke responded. Plaintiff sent this to Media review and they decided that this was not eligible for review due to being a *documentary* and not qualify as B.1b. And prohibited per A3d of the media policy.

130. On September 10 2020, Ms. Hyke responded this was already decided. Chose a disposition by the deadline.

131. On September 25, 2020, Mr. Stevens requested ACD Schesso to review his DVD. He asked to have the DVD Truth About Drugs reviewed that was considered contraband.

132. Stevens informed ACD Schesso the DVD is part of his drug educational course taking from the Drug Free World. He further informed Schesso his Scientology minister ordered it and the Drug Free World Program Coordinator Jodi Shervell opined it as an educational course-authorized per policy.

133. October 10, 2020, ACD Schesso responded; "This is not eligible for review as it is considered to be a documentary rather than skill teaching."

134. On October 20, 2020, Mr. Stevens grieved his denials to Assistant Facility Director Terry Kneisel. Mr. Stevens grievance included the DVD "Truth About Drugs" was Ordered by a Scientology member and is part of his current "Truth About Drugs Course that he has.

135. Stevens informed Mr. Kneisel that policy does not identify a "documentary" as reason for denial. The DVD is authorized as educational or related to mindfulness under B1(d) of policy attached. Please reverse the treatment team decision.

136. On November 3, 2020, Director Kneisel responded: "I have looked into your concern. You appealed MRT's Decision to the ACD which denied your appeal. Per policy you will need to send out the DVD. I encourage you to follow the Clinical Chain of Command to resolve any remaining concerns you may have."

137. On October 29, 2020, prior to Mr. Stevens receiving his denials to Defendant Kneisel. He again begged that he doesn't expect him to understand Scientology, but he has DVD titled Scientology Overview. The DVD is about Scientology making a public announcement to support like minds of "Truth About Drug Organizations.

138. Mr. Stevens expressed his feeling of how it frustrates him that the morals and values of others are disregarded.

139. On October 30, 2020, while Mr. Kneisel was processing of his requests, Mr. Stevens met Defendant Kneisel on Moose Lake Street at 11:30 a.m. and made inquiries into his DVD. He informed Defendant Kneisel that the DVD related to his Scientology faith practices and Scientology has plans for him after completing the course to be a drug educator and field representative for Narconon.

140. Mr. Stevens further identified this DVD is spiritual to his Scientology practices and is rehabilitating to his human condition.

141. Mr. Kneisel praised Mr. Stevens for these aspirations

142. Mr. Stevens plead with Mr. Kneisel that denial of the DVD as a *documentary* is not part of policy and the Drug Free World Program Coordinator Shervell, has determined it to be educational, as authorized by policy.

143. Defendant Kneisel informed Mr. Stevens his appeal process is over, but he will talk with Peter Puffer and Kevin Moser.

144. Mr. Stevens informed Mr. Kneisel that he was previously denied release by the Special Review Board that he had not worked on substance abuse diagnosis.

145. On November 4, 2020, Defendant Kneisel  responded and directed Mr. Stevens to send out his DVD Truth About Drugs

146. On November 12, 2020, Mr. Stevens wrote Facility Director Keven Moser with his concerns that his chain of communications and grievances end at his desk.

147. Mr. Stevens informed Mr. Moser his DVD "Truth About Drugs is from the Drug Free World Organization supported by Scientology and is authorized under policy. The DVD is spiritual or mindful and available on the Scientology Network.

148. Mr. Stevens informed Moser that he received a Truth About Drugs educator kit and DVD from the Drug Free World Org.  The Scientology religion works with likeminded members of the Drug Free World Organization.

149. On November 13, 2020, Mr. Moser responded "your appeal from media is in the clinical department and they have made the decision. My understanding is ACD Schesso is the staff you will need to work with.

150. On November 16, 2020, Mr. Stevens again wrote ACD Schesso a request and attached Facility Director Moser's response. Mr. Stevens request included he was asking for her to reconsider his spiritual DVD that aids in his mental health progression as a practicing Scientologist

151. On November 19, 2020, ACD Schesso responded; "Mr. Stevens, I am not opposed to the DVD. However, as it stands the DVD is considered contraband according to the media policy. *The DVD is considered a documentary by the Church of Scientology which does not teach a specific skill.*"

152. On November 21, 2020, Mr. Stevens DVD Truth About Drugs that is educational/instructional, teaches a skill in drug education, related to spirituality of Scientology and is mindfulness of the truth about the harms associated with drug use was disposed of by property staff.

153. Plaintiff Stevens has been subject to and injured by these alleged violations as a direct and proximate result of Defendants' acts and omissions as specifically set forth above. Unless relief is granted, Plaintiff will continue to be injured as a direct and proximate result of Defendants' acts and omissions specifically set forth above.

**CAUSES OF ACTION UNDER 42 U.S.C. 1983**

154. Plaintiff has brought suit against Defendants pursuant to 42 U.S.C. 1983, which provides: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.] 42 U.S.C. 1983.

155. The purpose of 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights.

## FIRST COUSE OF ACTION
### Violation Of Procedural Due Process of The Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. 1983 42 U.S.C. 1983

156. Plaintiff incorporates all previous allegations as if fully set forth herein.

157. The Fourteenth Amendment guarantees that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Plaintiffs bring this Fourteenth Amendment claim pursuant to 42 U.S.C. § 1983.

158. The Minnesota Commitment and Treatment Act does not provide procedural due process to clearly established adversarial hearing before Stevens was transferred back to the MSOP in November of 2014, at the expiration of the term of probation, at which point civil commitment proceedings were required prior to continued confinement.

159. Plaintiff alleges this clearly established violation of his Fourteenth Amendment procedural due process rights based both on defendants' failure to conduct "meaningful"

reviews of whether he continued to meet the criteria as a Sexually Dangerous Persons that were required to support his continued confinement in restrictive housing and ongoing stigmatization by being transferred to the MSOP without hearing.

160. In addition to an adversarial hearing that transferring his file out of medical treatment program for the dangerously mentally ill to a program for treating past crimes.

161. Plaintiff is currently being held for program to address his for past crimes, despite his criminal sentence has expired while remaining at the DHS facility.

162. Defendants have continued to deprived Plaintiff of procedural due process that would include formal written notice and judicial hearing after being discharged from this program in 2006 and re-admission since 2014.    As prior to admission and after admission, evidence of observable behaviors showed he did not have any mental health concerns.

163. Defendants have further denied Plaintiff any meaningful remedies and opportunity to regain his liberties in violation of his procedural due process rights.

164. Further MSOP Policy Number: 215-5060; States: "The SRB does not have statutory authority to: progress a client through MSOP's treatment phases; or direct MSOP to provide new or different treatment opportunities to a client.

165. Thus Plaintiff is without remedy to challenge the defendants changes to state tactics upon using MSOP facilities to enhance older weaker criminal sentences for sex offender treatment upon the non-mentally ill in violation of procedural due process as well.

## SECOND COUSE OF ACTION
Violation Of The Fifth Amendment  to the United States Constitution pursuant to  42
U.S.C. 1983 42 U.S.C. 1983

166. Plaintiff incorporates all previous allegations as if fully set forth herein.

167. Defendants by confining Plaintiff through the use of civil commitment for DHS sex offender program upon non-mentally ill offender enhanced the term of conditional release sanction without first violating the terms of release that violates the Double Jeopardy Clause of the Fifth Amendment  to the United States Constitution

168. In addition, to enhancing such sanctions, the Department involuntarily re-admitted Plaintiff at the conclusion of his criminal conditional release term for a program upon non-mentally ill offenders designed to educate and hold Plaintiff accountable for his past crimes.   Thus the additional confinement based upon past crimes is punitive, and therefore violates the Double Jeopardy Clause of the Fifth Amendment  to the United States Constitution

169. As a result of defendants acts, omissions, practices and conduct, Plaintiff has been deprived of his constitutionally protected right to be free of double punishment for the same crime.

## THIRD COUSE OF ACTION
Cruel and Unusual Punishment in Violation Of The Eighth Amendment through the
Fourteenth  Amendment to the United States Constitution pursuant to  42 U.S.C. 1983 42
U.S.C. 1983

170. Plaintiff incorporates all previous allegations as if fully set forth herein

171. The Eighth Amendment to the United States Constitution, which prohibits cruel and unusual punishments, require that persons who are involuntarily confined due to an asserted mental health disorder be provided with adequate treatment for that disorder.

172. Defendants conduct also demonstrates a deliberate indifference to the well-being of Plaintiff by turning a blind eye to adequate care under his Eighth and Fourteenth Amendment.

173. Defendants have abandoned professional standards of care by being deliberate indifference-with the requisite state of mind when providing that inadequate diagnosis.

174. Plaintiff's expert shows the deliberate indifference in an adequacy of care claim for diagnosis falling below a professional standard by diagnosticians .

175. As a result of defendants acts, omissions, practices and conduct, Plaintiff has been deprived of his constitutionally protected from cruel and unusual punishment.

### FOURTH COUSE OF ACTION
Free Exercise Clause of the First Amendment to the United States Constitution
pursuant to  42 U.S.C. 1983 42 U.S.C. 1983

176. Plaintiff incorporates all previous allegations as if fully set forth herein

177. The U.S. Constitution's First Amendment, incorporated against the states by the Fourteenth Amendment, protects the free exercise of religion: Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof…

178. The Free Exercise clause applies here because the Departments failure to accommodate Plaintiff spiritual  practices; "prohibits the free exercise of religion" by the Department.

179. The Department is a government agency.

180. The Department has imposed a substantial burden on the religious exercise of Plaintiff, by failing to accommodate his religious practices that prohibits group therapy and thus prevents his progress to obtain additional services, such as additional paid vocational training hours and reintegration services necessary to grow with society.

181. Although Plaintiff attends all his individual one on one sessions and turns in assignments on the view of Scientology's studies as applied to the Matrix Factors.

182. All of Plaintiff's turned in assignments is not enough to progress, the Department wants Plaintiff to attend group processing to teach other group member of his experiences and how he overcame his past offending as he applies those technics to the Matrix Factors.

183. The department will not support plaintiff's social growth or value his rehabilitation on past offending until he attends groups, knowing it places substantial burden on his faith practices of does and don'ts of Scientology .

184. Because of the Department failure to accommodate the Scientology religious practices, Plaintiff has not been able to advance within the program, received integration services, or receive advanced benefit from the services provide by the Department due to the exercise of his spiritual practices.

185. Plaintiff recognizes the religious importance of following its religious material,. This includes the Department's need to provide and support moral values, guidance, the

sense of respect for religious beliefs, to remove doubt or any beliefs when practicing. Notwithstanding Plaintiff's request for accommodations from Defendants, his religious practices also help others understand the importance of his self-auditing, and to help others practicing or would be practitioners to understand his respective religious teaching.

186. The Department's failure to accommodate is not in furtherance of a compelling government interest.

187. The Department has imposed a substantial  burden on the religious exercise is further evidence  his religious practices are not in the least restrictive means of furthering that compelling state interest.

188. The Department has imposed a substantial  burden on the free Exercise Clause without finding Stevens has a present mental illness that causes his dangerousness necessary to trump religious freedoms or attend local services and events held.

189. The Department failure to accommodate Plaintiff's spiritual practices violates MSOP non-discriminatory policies and its theory manuals accommodations to individuals culture.  Defendants has imposed a substantial burden on the religious exercise of Plaintiff federally-protected religious activities.

190. The Department's has caused injury to Plaintiff which is real and concrete.

191. This Court favorable decision under the Free Exercise Clause for the requested relief will redress the MSOP spiritual policies and Plaintiff's  injuries and allow Plaintiff to exercise his federally protected religious rights.

## FIFTH COUSE OF ACTION
Viewpoint Discrimination of the First Amendment to the United States Constitution
pursuant to  42 U.S.C. 1983

192. Plaintiff incorporates all previous allegations as if fully set forth herein

193. The U.S. Constitution's First Amendment,  protects speech;  Congress shall make no laws abridging the freedom of speech.                                          .

194. First Amendment's text prohibits laws "abridging the freedom of speech."

195. The Department is a government agency that creates a limited public forum for speech, an such it may not discriminate against speech on the basis of its viewpoint.

196. Defendants Puffer, Moser, Kneisel and Schesso collectively not only suppressed speech from the DVD speaker from the Drug Free World Educator unreasonably, but also in light of the purpose served by DVD, Defendant engaged in viewpoint-based discrimination on the education of Plaintiff from speech on the dangerous of drugs and youth.

197. Defendants Puffer, Moser, Kneisel and Schesso collectively engaged in viewpoint discrimination from the speech on the DVD was considered contraband according to the media policy.   Defendant Schesso's viewpoint included,  *the DVD is considered a documentary by the Church of Scientology which does not teach a specific skill.*

198. Defendants Puffer, Moser, Kneisel and Schesso collectively could not deny Plaintiff the right to obtain a drug educational speech solely because the media dealt with an otherwise permissible subject from a religious standpoint.

199. Defendants Puffer, Moser, Kneisel and Schesso not only engaged in viewpoint discrimination towards Drug Free World speakers that make public announcements on the dangers of drug use in today's society.  Defendants Puffer, Moser, Kneisel and Schesso clearly understood the viewpoint discriminations towards Scientology's views on drugs and the dangerous of drugs in today society.

200. Defendant Puffer, Moser, Kneisel and Schesso actions discriminated against speech on the basis of its viewpoint in violation of Plaintiff's clearly established  First Amendment rights without a compelling state interest.

201. Defendant Puffer, Moser, Kneisel and Schesso has caused injury to Plaintiff which is real and concrete.  Puffer, Moser, Kneisel and Schesso clearly understood this DVD was part of larger drug course necessary for Plaintiff's future employment as a field representative with Narconon Drug Treatment Center ran by Scientology.

202. Defendant Puffer, Moser, Kneisel and Schesso has caused injury to Plaintiff which is real and concrete.  Puffer, Moser, Kneisel and Schesso clearly understood Plaintiff carries a substance abuse disorder that required rehabilitation as recommended by the Commissioner's review boards to obtain reintegration services.

203. This Court's favorable decision under Plaintiff's First Amendment speech rights that prohibits viewpoint discrimination will cure the requested relief for injuries in fact and damages.

**FIFTH COUSE OF ACTION**
Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C.S. 2000cc

204. Plaintiff incorporates all previous allegations as if fully set forth herein

205. RLUIPA states: No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government establishes that imposition of the burden on the person –

> (1) is in the furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest

42 U.S.C.S. 2000cc-1

206. Under RLUIPA, jurisdiction in this Court is invoked because "the substantial burden [on religion] affects, or removal of the substantial burden would affect, commerce with foreign nations, among the several States.." 42 U.S.C. §2000cc.

207. The DHS is a government agency. The DHS has overall responsibility for the MSOP. The Commissioner, Jodi Harpstead, in her official capacity, is responsible for the Department.

208. Marshall Smith is the Chief Executive Director of DCT for the MSOP. He oversees policies and their implementations as they affect incarcerated clients in a non-discriminatory way by way of MSOP Executive Director Nancy Johnston.

209. Nancy Johnston is the MSOP Executive Director. Johnston wrote and implemented the policy at issue prohibiting Scientology accommodations as requested by Plaintiff.

210. Defendants are interrelated and intertwined together as it relates to the creation of enforcement of preventing Stevens from progressing in the program unless he consents to programing as alleged in the complaint, collectively "the Department."

211. The department has imposed a substantial burden on the religious exercise of Plaintiff, the MSOP program prevents accommodation to Scientology.

212. Without accommodation plaintiff religious beliefs are substantial burdened.

213. Because of the Department policy to attend group processing to advance in the program, Plaintiff is prevented from attending church services at the Local Church of Twin Cities.

214. Because of Plaintiff recognition of the importance of spiritual belief and practices, Defendants fail to accommodate his request for an individualized program or understand Scientology's respective religious teaching necessary to accommodate his practice.

215. The failing to accommodate spiritual practices is not in furtherance of a compelling government interest.

216. In addition, by not accommodating Stevens spiritual practices is not in the least restrictive means of furthering that compelling state interest to confine the dangerously mental illness that Defendants had previously removed Stevens from such classification.

217. The Department's ban on Scientology's practices violates the MSOP spiritual federal rights under RLUIPA.

218. The Department has imposed a substantial burden on the religious exercise of Plaintiff, by failing to accommodate his religious practices that prohibits group therapy and thus prevents his progress to obtain additional services, such as additional paid vocational training hours to purchase additional spiritual material from other states and give support to other counties, as well as reintegration services necessary to grow with society.

219. In addition, The Department denies Plaintiff from attending church services and events at the Local Church, despite experts have found Stevens does not to have a mental illness that causes his dangerous under state law.

220. Additionally, RLUIPA applies because the Department's ban on this type of spiritual practices affects, commerce with foreign nations, among the several States, 42 U.S.C.S. 2000cc-1.

221. Because of the burdens on spiritual practices, Plaintiff is not engaging in commerce to personally purchase hundreds, if not thousands of dollars of religious material, such as books, jewelry, media, magazines, clothing, and specific vitamins to aid his spiritual practices that assist others in need around the world.

222. If a nationwide burden were put on spiritual practices, such as the Department's, the United States' commerce with foreign nations, among the States, or with would be significantly affected.

223. Under RLUIPA the department's current policy has interfered Plaintiff's spiritual practices that are federally-protected religious activities.

224. Under RLUIPA the Department's has caused injury to Plaintiff which is real and concrete.

225. This Court favorable decision under RLUIPA for the requested declaratory relief will redress the Departments spiritual injuries and allow Plaintiff to exercise his federally protected religious rights.

**FOURTH COUSE OF ACTION**
Violation Of The American with Disabilities Act (ADA), 42 U.S. 12132

226. Plaintiff incorporates all previous allegations as if fully set forth herein

227. The mental abnormities, personality disorders, chemical dependency and substance abuse disorders that form the basis for the civil commitment of Plaintiff constitutes disabilities as the term is used in the American with Disabilities Act (ADA), 42 U.S. 12102

228. Defendants have discriminate against Plaintiff in violation of the ADA, because they have failed and refused to reasonable accommodate Plaintiff's handicap by providing adequate mental health care; they have denied plaintiff access to mental health treatment and educational material and programs afforded to other civilly committed person; they have excluded plaintiff from participating in and denied him the benefits of the services, programs or activities of a public entity on the basis of disability; and they have failed to administer services, programs and activities in the most integrated setting appropriate to the need of qualified individual with disabilities in violation of 28 C.F.R.§ 35.130(d)

## FIFTH COUSE OF ACTION
### Violation Of section 504 of the Rehabilitation Act, 29  U.S.C. §794

229. Plaintiff incorporates all previous allegations as if fully set forth herein

230. Defendants have discriminated against Plaintiff in violation of section 504 of the Rehabilitation Act, 29  U.S.C. §794, as amended by the Civil Rights Restoration Act of 1987, by failing to reasonably accommodate his handicaps, failing to provide adequate mental health care; excluding him from participating in and denying him the benefits of programs for which they would otherwise qualify, by reasons of this disability; subjecting him to discrimination based upon disability; and denying him access to mental health treatment, drug educational material and vocational programs.

### PRAYER FOR RELIEF.

Wherefore, plaintiff request that this court;

    a. Plaintiff's request his complaint be liberally construed and judged by substance not form.

    b. Adjudge and declare that the acts, omissions, policies, and practices of the Defendants violate the Fifth, Eighth, and Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. §1983; American with Disabilities Act (ADA), 42 U.S. 12132: section 504 of the Rehabilitation Act, 29  U.S.C. §794: 42 U.S.C. §2000cc (RLUIPA).

    c. Enjoin defendants , together with their agents, officials, employees and all person acting in concert with tem, under color of state law or otherwise, from

continuing the unconstitutional and illegal acts, conditions and practices described herein.

d.  Order defendants together with their agents, officials, employees and all person acting in concert with tem, under color of state law or otherwise, take all necessary actions to (1) provide Plaintiff with sufficient and effective individualized treatment plan for any mental abnormities, personality traits and chemical dependency treatment were clinically indicated; (2) provide Plaintiff with a formal notice and hearing explaining for why he was transferred out of a medical treatment program for dangerously mentally ill sex offenders which may be reason for advancing him within the program, (3) assist Plaintiff with a meaningful discharge plan.

e.  Declare that Defendants Minnesota DHS Commissioner, Jodi Harpstead, in her official capacity as Commissioner of the DHS, Marshall Smith, Chief Executive Director of DCT for the MSOP. Executive Director Nancy Johnston in her official capacity that violated Plaintiff's federally-protected religious rights under the Free Exercise Clause of the U.S. Constitution.

f.  Grant declaratory relief that the Defendants Minnesota DHS Commissioner, Jodi Harpstead, in her official capacity as Commissioner of the DHS, Marshall Smith, Chief Executive Director of DCT for the MSOP. Executive Director Nancy Johnston in her official capacity that violated Plaintiff's federally-protected religious rights under Religious Land Use and Institutionalized Persons Act .

g.  Award Plaintiff all costs, expense and expert witness fees allowed by law.

h.  Issue a declaration by the court finding Defendants in their official capacity have engaged in unfair and discriminatory vocational training employment practices that violate the religious practices of Plaintiff.

i.  Grant a Writ of Habeas Corpus pursuant to 28 U.S.C. 2241seeking an Order discharging Plaintiff from the MSOP that includes procedural safeguards.

j.  In the alternative, if the Writ of Habeas Corpus pursuant to 28 U.S.C. 2241 is not appropriate, Plaintiff request the Court to entertain supplemental jurisdiction of State Habeas pursuant to Minn. Stat. 484.03-4, discharging Plaintiff from the MSOP that includes procedural safeguards.

k.  Award damages in excess of $750,000.00 for each injury in fact for liability found under appropriate causes of actions.

l.  Grant such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues so triable.

Dated: March 10, 2021

Brad Stevens.
1111 Highway 73
Moose Lake, Minnesota. 55767